UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ALFRED W. MYERS, individually and as trustee of MYERS REALTY TRUST,<br>   Plaintiff<br><br>  v.<br><br>THE TRAVELERS INDEMINITY COMPANY, THE TRAVELERS INDEMINITY COMPANY OF AMERICA, THE CHARTER OAK FIRE INSURANCE COMPANY, and THE TRAVELERS INDEMINITY COMPANY OF CONNECTICUT f/k/a THE TRAVELERS INDEMINITY COMPANY OF RHODE ISLAND,<br>   Defendants. | C.A. NO. 11-40157-TSH |

## MEMORANDUM OF DECISION AND ORDER
March 27, 2014

**HILLMAN, D.J.**

### Introduction

Plaintiff, Alfred W. Myers, individually and as trustee of the Myers Reality Trust[1], seeks monetary damages and declaratory relief for the alleged failure of the Defendants, The Travelers Indemnity Company, the Travelers Indemnity Company of America, The Charter Oak Fire Insurance Company, and The Travelers Indemnity Company of Connecticut (collectively, "Travelers") to provide insurance coverage for environmental contamination that occurred on property owned by Myers in Sutton, Massachusetts. Travelers seeks summary judgment on the

---

[1] La-Myers, Inc. ("LaMyers") operated an auto parts recycling and salvage business on property located at 79 Worcester-Providence Turnpike, Sutton, Massachusetts. Alfred Myers was the dominant shareholder and primary officer of LaMyers. In 1985, Alfred Myers deeded the property to Myers Realty Trust. For ease of reference, Alfred Myers, individually and in his capacity as trustee of Myers Realty Trust, shall be referred to herein as "Myers."

grounds that: (1) Myers is precluded from recovering under the applicable Policies (as hereinafter defined) because he breached the Policies' voluntary payment provisions, incurred the majority of costs for which he seeks reimbursement before he tendered notice to Travelers, and his untimely notice prejudiced Travelers, as a matter of law, *see Travelers Motion For Summary Judgment On Voluntary Payments, Pre-Tender Costs, And Late Notice (Docket No. 41)*; and (2) the damage for which Myers seeks reimbursement is not covered under the applicable Policies, is precluded from coverage under the Policies' pollution exclusions and/or Myers has failed to establish bad faith, *see Travelers Mot. For Sum. J. On Covered Property Damage, Pollution Exclusion, And Bad Faith* (Docket No. 43). For the reasons set forth below, Travelers' motion for summary judgment is granted on the grounds that Myers breached the Policies voluntary payment provisions and is not entitled to pre-tender defense costs.

**Facts**

*Background Facts*

From late 1974 until November 2005, Myers owned and operated an auto parts recycling and salvage business at 79 Worcester-Providence Road in Sutton, Massachusetts (the "Site"). During a portion of that same period (roughly 1976-1995), Myers and his businesses were insured by Travelers under 37 separate insurance policies, consisting of Motor Vehicle Garage policies (the "Garage Policies"), General Liability policies (the "CGL Policies"), and Catastrophe Umbrella policies (the "Umbrella Policies") (collectively, the "Policies").

Incidental to the auto salvage business, hazardous substances were used and stored at the Site. Hazardous substances used at the Site included, without limitation, mercury, Freon, antifreeze, oil, gasoline, brake fluid, and grease. Myers disposed of residue oil in an oil-water

2

separator located at the Site. The oil-water separator separated water and oil, and had a valve which allowed water to escape into a pit located on Site.

Late in 2005, Myers learned that a private drinking well on the Site was contaminated with methyl tertiary butyl-ether ("MTBE"), tertiary amyl methyl ether ("TAME"), and lead. Myers retained environmental engineering service Loitherstein Environmental Engineering Inc. ("LEEI"). On December 29, 2005, LEEI, on behalf of Myers, duly reported the contamination to the Massachusetts Department of Environmental Protection ("DEP").

On January 5, 2006, the DEP issued a Notice of Responsibility letter to Myers which stated that: "The MassDEP has identified the property, or portions thereof, as a disposal site, which requires the conduct of cleanup or other response actions." In response, Myers conducted an environmental assessment of the Site. As a result of the environmental assessment, Myers found oil and other hazardous materials in the soil and groundwater at the Site.

On June 22, 2006, the DEP issued a Notice of Responsibility letter (the "NOR") to Myers, which stated: "the property at 79 Worcester-Providence Turnpike, Sutton has been subject to a release that has resulted in the presence of oil and hazardous materials in the soil at concentrations that exceed the applicable Reportable Concentrations… MassDEP has reason to believe that the property, or portions thereof, is a disposal site that requires a response action." In an October 18, 2006 letter, the DEP identified Myers as a Potentially Responsible Party ("PRP") with respect to the release of oil and other hazardous chemicals at the Site. The PRP letter states: "MassDEP has reason to believe that you are responsible for cleaning up the release of oil and/or hazardous materials at [the Site]."

In response to the NOR and PRP letters, Myers proceeded to monitor and remediate the site. His remediation efforts ended in November of 2008 and included the excavation and

removal of the oil-water separator on the Site, removal and disposal of 750 gallons of oily water and sludge from the separator, digging a test pit, de-watering of the area where the separator was excavated, removal and disposal of an additional 1,300 gallons of oily water, and the excavation of 40 cubic yards of soil.  LEEI believed that the oil water separator was the principal source of contamination at the Site.   When the separator was removed on November 16, 2006, there was an "oily" odor. At the time it was removed, the oil water separator was broken apart and removed from the Site.   As of November 2008, no additional remediation was necessary at the Site.   On October 18, 2010, LEEI submitted a Response Action Outcome ("RAO") statement to DEP.  According to LEEI, the RAO effectively closed out the Site.

Neither LEEI nor Myers can identify how or when contamination occurred at the Site.  Myers did not notify Travelers of the contamination until May 27, 2009, which is after his remediation efforts had concluded.   Travelers responded in writing on June 19, 2009 and requested additional information.   The parties exchanged several letters from approximately June 2009- January 2011.   In a letter to Travelers dated August 14, 2009, Myers claimed to have expended $106,570.22 "to date," in costs for which he sought reimbursement.   The letter did not include documentation for all the costs, and the invoices that were included reflected that only $86.90 of the claimed costs were incurred after May 27, 2009.   It was not until November 30, 2009, that Myers sent Travelers a copy of the NOR (which Myers received in June 2006).

By letters dated March 10, 2010, January 5, 2011 and April 6, 2011, Travelers acknowledged that they would defend Myers under several of the Policies under a reservation of rights.   Myers never responded and never provided Travelers with any defense-related invoices.  Travelers has not conducted an investigation into the cause of the damage to the Site and has not made any offer of coverage under the Policies.   Myers claims to have incurred $133,300.12 in

4

damages with respect to the contamination at the Site, to repair damages to the Site, mitigate damages, prevent and mitigate damages to the surrounding properties and make required annual payments to the DEP. Myers never sought consent or approval from Travelers prior to incurring any of the claimed damages.

At the time Myers became aware of contamination at the Site, he was unaware that applicable insurance coverage might have existed. Myers notified Travelers as soon he was informed by his insurance agent that insurance coverage might be available for the contamination at the Site. Myers cannot identify any of his employees who worked at the Site during the relevant period and has no documents or records relating to his employees (they have been destroyed). Additionally, Myers maintained manifest regarding the use of hazardous substances at the Site, but none have been produced to Travelers and it is not clear they still exist.

*The Policies*

***The Garage Policies***

Travelers issued Garage Policies to Myers from: (A) January 1, 1976 to January 1, 1977; (B) January 1, 1984 to January 1, 1987; (C) January 1, 1988 to August 1, 1989; and (D) August 1, 1991 to August 1, 1995. Generally, the Garage Policies provide that Travelers will pay damages because of bodily injury or property damage caused by accidents which arise out of the hazards described therein. The Garage Policies apply only to accidents which occur and losses sustained during the policy period.

With respect to notice and cooperating with the insurer, the Garage Policies state that:

> In the event of an accident or loss, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstance thereof and the names and addresses of the injured and of available witnesses, shall be

given by or for the insured to the company or any of its authorized agents as soon as practicable… If claim is made or suit is brought against the insured he shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

….

… The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than expense under Part I for first aid to others at the time of accident or under division 2 of coverage A [Personal Injury Protection].

The Garage Policies from January 1, 1976 to January 1, 1977, January 1, 1984 to January 1, 1987, and January 1, 1988 to August 1, 1989 do not contain a pollution exclusion.

The Garage Policies from August 1, 1991 to August 1, 1995 contain a pollution exclusion.

### *The CGL Policies*

Travelers issued CGL Policies to Myers from December 24, 1983 to January 3, 1995. The CGL Policies from December 24, 1983 to January 3, 1987 state:

The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of Coverage A-bodily injury or Coverage B-property damage to which this insurance applies, caused by an occurrence…

….

"Occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

….

> "Property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom…
>
> ….

The CGL policies further provide that in the event of an "Occurrence," "Claim" or "Suit," the Insured's duties, are to provide to Travelers or their authorized agents as soon as practicable:

> written notice containing particulars sufficient to identify the Insured and also reasonably obtainable information with respect to the time, place and circumstances of the occurrence, and the names and addresses of the injured and of available witnesses

Furthermore, if a claim is made or suit brought against the Insured, the CGL policies require that the Insured immediately forward to Travelers "every demand, notice, summons or other process received by the Insured or the Insured's representative." And, the Insured is prohibited, except at his own cost, from voluntarily making any payment, assuming any obligation or incurring any expense other than for first aid to others at the time of accident.

The CGL Policies in effect from January 3, 1987 to January 3, 1991, from January 3, 1991 to January 3, 1995 all have similar, but not identical language. Furthermore, all of the CGL Policies from January 3, 1991 to January 3, 1995 contain a pollution exclusion.

### *The Umbrella Policies*

Travelers issued Umbrella Policies to Myers from February 2, 1984 to January 3, 1995. The Umbrella Policies from February 2, 1984 to January 3, 1986 provide:

> The Travelers will indemnify the Insured for all sums in excess of the deductible amount which the Insured shall become legally obligated to pay as damages because of injury to which this policy applies. Subject to the exclusions and all other provisions of this policy, the injuries to which this policy applies are: ... 2. Property Damage - which means (a) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom….

7

These policies require that the Insured give written notice to Travelers, as soon as practicable, when bodily injury or property damage occurs, or an act or omission takes place which may result in personal injury, medical injury, or advertising injury, if such injury is reasonably likely to involve the policy.

The Umbrella Policies from January 3, 1986 to January 3, 1991 contain a similar notice provision to that of the February 2, 1984 to January 3, 1986 policies. The January 3, 1986 to January 3, 1981 policies further provide that, subject to policy exclusions, "Travelers will indemnify the Insured for all sums in excess of the deductible amount which the Insured shall become legally obligated to pay as damages because of injury to which this policy applies." These policies contain a pollution exclusion.

The Umbrella Policy from January 3, 1991 to January 3, 1992 provides:

We will pay on behalf of the insured all sums in excess of the "retained limit" that the insured becomes legally obligated to pay as damages because of "injury" to which this policy applies…. This insurance applies only to the following "injury": (1) "Bodily injury" or "property damage": (a) occurring in the "coverage territory" during the policy period; and (b) caused by an "occurrence"...

….

"Occurrence" means: (1) with respect to "bodily injury" and "property damage," an accident, including continuous or repeated exposure to substantially the same general harmful conditions…

….

"Property damage" means: (1) physical injury to tangible property, including all resulting loss of use of that property…

This Policy also contains a pollution exclusion. The Policy also includes a notice provision which provides that in the event of an "Occurrence," "Offense," Claim or "Suit" covered by the policy which may result in the damages payable thereunder, the Insured must give prompt

8

written notice to Travelers, which includes: " (a) how, when and where the 'occurrence' or 'offense' took place; (b) the names and addresses of any injured persons and witnesses; and (c) the nature and location of any "injury" or damage arising out of the 'occurrence' or 'offense.'" Furthermore, if a claim is made or suit brought against the Insured which may result in a claim under the policy, the Insured is required to immediately send Travelers "copies of any demands, notices, summonses or legal papers received in connection with the claim or suit." Finally, as to any "occurrence," "offense," claim or suit that may result in a claim under the policy, the Insured must: "Comply with the terms of the 'underlying insurance'; … Not admit liability or jeopardize [Traveler's] rights after an 'occurrence' or 'offense'; and (e) not, except at [the Insured's] own cost, voluntarily make a payment, assume any obligation, or incur any expense without [Travelers'] consent."

The Umbrella Policies from January 3, 1992 to January 3, 1995 have similar provisions to the January 3, 1991 to January 3, 1992 policy regarding amounts that Travelers will pay thereunder because of "injury". These policies also include a pollution exclusion. The Insured's duties under these policies in the event of an "Occurrence," "Offense," "Claim" or "Suit" are similar to the duties in the January 3, 1991-January 3, 1992 policy. This is true with respect to both the notice provisions and the voluntary payment provisions.

## Discussion

### *Standard of Review*

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A

9

"genuine" issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case.'" *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004) (internal citation omitted).

The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Sensing*, 575 F.3d at 153. "Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial." *Id.* (citing *Carroll*, 294 F.3d at 236). These facts must not be merely allegations or denials of the moving party's pleadings. *Id.* Both "[c]onclusory allegations [and] improbable inferences" are insufficient to overcome summary judgment. *Sensing*, 575 F.3d at 153 (citing *Carroll*, 294 F. 3d at 236-37 (internal quotations omitted). "The test is whether, as to each essential element, there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'"*Sensing* 575 F.3d at 153 (citations omitted).

*Interpretation of an Insurance Policy*

Massachusetts law provides that interpretation of an insurance policy is a question of law for the court. The court applies general rules of contract interpretation, and looks first to the actual policy language, which is "'given its plain and ordinary meaning.'" *Valley Forge Ins. Co. v. Field,* 670 F.3d 93, 2012 (1st Cir. 2012). Like all contracts, an insurance policy is to be construed according to the fair and reasonable meaning of its words. Exclusionary clauses must be strictly construed against the insurer so as not to defeat any intended coverage or diminish the protection purchased by the insured. *See Vappi & Co.,* 348 Mass. at 431-432, 204 N.E.2d at 276 (1965). Thus, where "the relevant policy provisions are plainly expressed, those provisions must

be enforced according to their terms and interpreted in a manner consistent with what an objectively reasonable insured would expect to be covered." *Vicor Corp. v. Vigilant Ins. Co.*, 674 F.3d 1, 11 (1st Cir. 2012)(internal citation omitted).

### *Whether Travelers Properly Denied Coverage Under the Voluntary Payment Provision and Whether Myers is Entitled to Pre-Tender Defense Costs*

Travelers argues that Myers breached the Policies' "voluntary payment" provisions by arranging for the clean-up of the contaminated Site and voluntarily paying for the clean-up prior to notifying them. Travelers further argues that they are not responsible for Myers's defense costs that were incurred before the claim was tendered to them. They claim that these "pre-tender costs" are not recoverable because Travelers' duty to defend did not arise until they received notice of the claim. Travelers also argued that Myers unduly delayed in giving them notice of the occurrence and that they were thereby prejudiced. Myers argues that Travelers is unable to show actual prejudice and therefore, they cannot invoke the voluntary payment provision to deny coverage and are liable for pre-tender costs. As to Travelers contention that coverage is barred because of the late notice, Myers argues that there is no fixed standard of time under the Policies by which he was obligated to provide notice to Travelers that he was seeking coverage to remediate the Site. Rather, he was obligated to notify Travelers as soon as practicable, that is, within a reasonable time. He argues that under the circumstances of this case, he notified Travelers within a reasonable period of time.[2]

---

[2] Myers learned of the contamination of the Site in November 2005, first received notice from the DEP in January 2006 and received the NOR from the DEP in June 2006. Assuming a thirty-five (35) month delay (calculated from the date he received the NOR from the DEP in June 2006) is the best case scenario for Myers. If the delay is calculated from the date that he discovered the contamination on the Site (the most likely case), the delay is about forty-three (43) months and if from the date that he received the first letter from the DEP (late January 2006), the delay would be about forty (40) months.

11

### *Whether Myers's Breach of the Voluntary Payment Provision Bars Coverage*

Although there may be some difference in the exact wording, the Policies all provide the insured will not, except at his own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without Travelers' consent.   In this case, Myers not only reached an agreement without Travelers' knowledge or consent, he made substantially all, if not all, of the payments for which he seeks reimbursement.

Massachusetts law is clear and unambiguous in holding that voluntary payments made by an insured prior to notifying its insurer are in breach of voluntary payment provisions like those contained in the Policies.   Travelers, citing to *Augat, Inc. v. Liberty Mutual*, 410 Mass. 117, 121, 571 N.E.2d 357 (1991), argues that where, as in this case, the insured voluntarily enters into an agreement to clean-up at a contaminated site, completes the site remediation and pays substantially the entire cost prior to notifying its insurer, prejudice to the insurer is presumed and, not only are such payments not recoverable, they results in the forfeiture of coverage.

While there is isolated language in *Augat* which could be read to support Travelers' position, the SJC's discussion, read in its entirety, requires the insurer to establish actual prejudice where the insured has violated the voluntary payment provision. The court discussed the fact that insurance policies are not a negotiated agreement and therefore, traditional breach of contract principles do not apply.   For that reason, prior to *Augat,* it had recognized that violation of a policy provision bars coverage "only where the breach frustrates the purpose under that provision," for example, "notice," consent-to-settlement," and "cooperation provisions." *Id.,* at 123, 571 N.E.2d 357.   The court noted that as to those types of provisions, it required the insurer to demonstrate that it was prejudiced before denying coverage.   *Id.* ( "Accordingly, we held that an insurer seeking to disclaim liability because of a breach of one of these provisions must

demonstrate that the breach actually prejudiced the insurer's position). The court then applied the same analysis to the voluntary payment provision and concluded that: "This analysis leads to a different result *when applied to the facts of this case.* Here too the purpose of the policy provision in question is to give the insurer an opportunity to protect its interests. *In this case*, however, the record clearly establishes that Augat's breach of the voluntary payment provision undermined that purpose," because after the insured entered into a consent judgment and assumed the obligation to pay the cost of the entire cleanup and, already paid a portion of the cost, "it was too late for the insurer to act to protect its interests. There was nothing left for the insurer to do but issue a check." *Id.* (emphasis added).

I agree that it is largely a matter of semantics as to whether the SJC held in *Augat* that prejudice will be presumed where the insured violates the voluntary payment provision by agreeing to pay the entire obligation without the insurer's consent, as opposed to reading its holding to be that under such circumstances, the insured has met its burden to establish actual prejudice, as a matter of law. I will note that the general consensus is that the latter formulation is the correct reading of the SJC's holding. *See, e.g., New England Extrusion, Inc. v. American Alliance Ins. Co.*, 874 F.Supp. 467 (D.Mass. 1995); *Atlas Tack Corp v. Liberty Mut. Ins. Co.*, 48 Mass.App.Ct. 378, 384, 721 N.E.2d 8 (1999); *Employers' Liability Assu. Corp. Ltd. v. Hoechst Celanse Corp.*, 43 Mass.App.Ct. 465, 634 N.E.2d 600 (1997)(SJC in *Augat* did not hold that prejudice is presumed where insured violates voluntary payment provision, rather court held that as matter of law, on facts of that case, insured was prejudiced); *but see Eastern Prod. Corp. v. Continental Cas. Co.*, 58 Mass. App.Ct. 16, 26 787 N.E.2d 1089 (2003)(In *Augat*, SJC explicitly held that prejudice will be presumed in case where prior to giving notice to insurer, insured had entered agreement to clean up site at its own expense). The bottom line is that if, because of the

13

insured's actions it is too late for the insurer to act to protect its interests, coverage is barred by the voluntary payment provision.[3]

In this case, by the time that Myers notified Travelers, he had cleaned the site and no additional remediation was necessary—indeed, he already substantially paid for the entire cleanup. Additionally, the presumed culprit (the oil-water separator) had been broken apart, and removed from the Site, the soil around the oil-water separator had been removed leaving no soil around the separator's former locus to be examined, the soil at the site was uncontaminated, Myers had destroyed records regarding his activities at the Site, and Myers was unable to identify any witnesses, including himself, who could provide testimony concerning the nature or timing of the contamination and clean up of the site. Under these circumstances, I find that the facts of this case present uncontroverted evidence of prejudice. More specifically, I find that Myers' breach "undermined the purpose of the voluntary payment clause— that of giving an insurer the opportunity to protect its interests," and therefore, Travelers is entitled to summary judgment as a matter of law. *Atlas Tack Corp*, 48 Mass.App.Ct. at 384, 721 N.E.2d 8 (where insured's breach of voluntary payment provision clearly undermined purpose of voluntary payment provision, *i.e.*, to permit insurer to protect its interests, no further showing of prejudice is required).

---

[3] *Augat* involved a claim for indemnification for environmental cleanup costs. The insured signed a consent agreement with the Commonwealth of Massachusetts and paid for partial clean up costs before notifying the insurer that it was seeking coverage for past and future clean up costs. The insured argued that its payments were not voluntary because it was faced with the choice of agreeing to a consent judgment, or the possibility of facing treble damages if it risked going to trial and lost. In holding that Augat's choice to enter the consent decree was voluntary, the court ruled that: "We conclude that the decision was 'voluntary,' however, because Augat had an alternative - it had the right to demand that Liberty Mutual defend the claim and assume the obligation to pay for the cleanup. Nevertheless, Augat failed to exercise this right. Thus, while Augat's decision obviously was not 'voluntary' in the sense of 'spontaneous' or entirely free from outside influence, it was 'voluntary' in the sense of 'by an act of choice,' Therefore, we conclude that the voluntary payment clause, if applied literally, would remove the cleanup costs from the scope of coverage under the policy." *Augat*, 410 Mass. at 122, 571 N.E.2d at 360.

**Whether Myers is Entitled To Reimbursement of His Payments as Pre-Tender Costs**

Myers attempts to distinguish this case from *Augat* by characterizing his payments as pre-tender defense costs which are not barred because Travelers cannot establish that they were prejudiced by Myers untimely notice to them of its duty to defend. More specifically, in his submissions and at the hearing, Myers represented that "virtually 100% of what we've asked them (Travelers) for is the recovery of pre-tender defense costs," that is, $106,000.00 of the $133,000.00 total for which he seeks reimbursement. In support of his position, Myers cites to Judge Woodlock's opinion in *Liberty Mut. Ins. Co. v. Black & Decker Corp.*, 383 F.Supp.2d 200 (2004) in which the court found that under Massachusetts law, pre-notice defense costs are recoverable absent prejudice to the insurer.

For purposes of this discussion, I will assume that $106,000 of the amount for which Myers is seeking reimbursement are properly characterized as pre-tender defense costs (a highly dubious proposition). I will also adopt Judge Woodlock's finding and assume that pre-tender defense costs are recoverable absent a showing of prejudice. *But see Managed Health Care Sys. Inc. v. St. Paul Fire & Marine Ins. Co.*, Civ. Act. No. 98-10831-GAO, 2001 WL 34114949 (D.Mass. Sep. 28, 2001)(under *Augat*, insurer should have not duty to pay costs of suit it had no opportunity to influence due to late notice)*; Hoppy's Oil Serv., Inc. v. Ins. Co. of N. Am.,* 783 F.Supp. 1505, 1509 (D.Mass. 1992); *see also American Mut. Liab. Ins. Co. v. Beatrice Cos., Inc.,* 924 F.Supp. 861, 873 (N.D.Ill. 1996)(applying Massachusetts law). Nevertheless, Myers's claims fail as a matter of law.

Myers makes much of the fact that Travelers could not identify one thing that they would have done differently to identify and remediate the Site. That argument begs the question since virtually all of the evidence had been destroyed by the time Travelers was notified, including valuable documentation about what may have caused the contamination and when it may have

occurred. That documentation could have provided valuable information not only to Travelers, but would have been of great assistance in determining whether in fact Travelers had been prejudiced. In any event, I find that Travelers was materially prejudiced by their inability to have any input as to managing the clean up and/or associated costs and therefore, they are entitled to summary judgment, as a matter of law.

Because I have found that Myers is barred from recovering under the Policies as a result of his breach of the voluntary payment provision and because he cannot recover the amounts paid as pre-tender defense costs, it is not necessary for me to address Travelers' remaining arguments that his claims are: (i) barred by because he did not give Travelers timely notice under the Policies, (ii) excluded from coverage under the Policies' pollution exclusion(s), and/or (iii) not covered under the Policies because no "Property Damage" took place within the relevant coverage period of any Policy.

## Conclusion

Travelers Motion For Summary Judgment On Voluntary Payments, Pre-Tender Costs, And Late Notice (Docket No. 41) is ***allowed***. Travelers Motion For Summary Judgment On Covered Property Damage, Pollution Exclusion, And Bad Faith (Docket No. 43) is ***denied***, as moot. Judgment shall enter for the Defendants.

    /s/ Timothy S. Hillman
**TIMOTHY S. HILLMAN**
**UNITED STATES DISTRICT JUDGE**